UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

ANNE PITRONE
17 Knoll Road
Tenafly, New Jersey 07670
        *Plaintiff*,

v.

M&T BANK, N.A.
One M&T Plaza
345 Main Street
Buffalo, New York 14203

        *Defendant*.

Case No.: _____

# COMPLAINT

Plaintiff Anne Pitrone ("Plaintiff" or "Ms. Pitrone"), by and through undersigned counsel, as and for her Complaint against Defendant M&T Bank, N.A. ("Defendant" or "M&T"), alleges as follows:

## NATURE OF THE ACTION

1. This case is a breach of contract action by which Ms. Pitrone, a 72-year-old resident of Tenafly, New Jersey, seeks to recover funds stolen after M&T ignored blatant and repeated evidence of suspicious banking activity connected to Ms. Pitrone's two personal accounts with M&T, ending in -1437 ("Account 1") and -4346 ("Account 2") (together, "the Accounts").

2. The relationship between M&T and Ms. Pitrone is one of a bank and its depositor, which the law recognizes as a contractual relationship between debtor and creditor. Because of that contractual relationship, M&T owes Ms. Pitrone a duty to exercise ordinary care in service of that relationship. M&T's duty of ordinary care is reflected in its Commercial Deposit Account

Agreement (the "Account Agreement"),[1] which expressly provides that M&T owes its banking customers a duty of ordinary or reasonable care, and to implement and maintain commercially reasonable policies and procedures to prevent and detect, *inter alia*, fraud. Account Agreement at §§ 16, 21.

3.  Sometime in 2023, M&T customer data was stolen in a large-scale data breach targeting the MOVEit file transfer software owned by Progress Software and used by M&T (the "Data Breach").[2] The data stolen in the breach included M&T customer names, addresses, and account numbers. Ms. Pitrone was a victim of this data breach, to which M&T notified Ms. Pitrone in a letter[3] (the "Notice Letter") that it would "continue to closely monitor [Ms. Pitrone's] accounts for potentially fraudulent activity". Notice Letter at 1. M&T did not notify its customers of the Data Breach until at least mid-August, when M&T sent customers a letter dated only "August 2023." *Id.*

4.  In August 2023, Ms. Pitrone was the target of a computer scam by which fraudsters hacked and froze her laptop and she received a window pop-up instructing her to call an 800-telephone number. Ms. Pitrone dialed the number and spoke with individuals who posed as "M&T Bank Investigator Security Agents" and "Microsoft Security Agents." They convinced Ms. Pitrone that M&T employees at her local M&T branch in Cresskill, New Jersey ("the Cresskill Branch")

---

[1] A true and correct copy of the Account Agreement, operative as of December 20, 2021, is attached hereto as Exhibit A, which, upon information and belief, reflects the relevant terms of the Account Agreement that was in effect during the period described in these pleadings. This Account Agreement is cited herein as "Account Agreement at [ ]."

[2] Caitlin Burchill, Some M&T Bank Customer Information Hacked in Massive Data Breach, NBC Connecticut (Aug. 30, 2023, 5:52 PM), https://www.nbcconnecticut.com/investigations/nbc-ct- responds/some-mt-bank-customer-information-hacked-in-massive-data-breach/3095301/.

[3] A true and correct copy of the Notice Letter is attached hereto as Exhibit B.

had sold her identity and personal banking information to criminals and that her savings were at risk of being stolen.

5. The fraudsters then told Ms. Pitrone that the only way to protect her savings was to wire her funds to a secure account at another financial institution while her local M&T branch was being investigated. The fake contacts at Microsoft and M&T convinced Ms. Pitrone to initiate multiple international wire transfers to send her savings to "safe" accounts with Hang Seng Bank in Hong Kong.

6. In the span of just four days, from August 4, 2023, to August 8, 2023, Ms. Pitrone initiated two wire transfers in-person at the Cresskill Branch and moved $478,000 out of her Accounts and into the hands of the fraudsters.

7. Ms. Pitrone had historically used the Accounts as any ordinary consumer banking customer would since she opened them with Hudson City Bancorp, Inc. more than two decades ago, prior to M&T's acquisition of Hudson City in 2015. Ms. Pitrone had never ordered a wire transfer from either of the Accounts and had never made any large transfers out of the Accounts otherwise.

8. While initiating the wire transfers, Ms. Pitrone interacted directly with M&T consumer banking personnel who observed her, reviewed her account information, and processed each wire transfer. No M&T employee properly questioned Ms. Pitrone's behavior or discussed with Ms. Pitrone the clear evidence that she was being scammed.

9. As a national association bank, M&T is subject to the Bank Secrecy Act ("BSA") and its implementing regulations, which establish an array of anti-money laundering ("AML") procedures and practices. Among other things, these procedures and practices mandate the tracking and reporting of all bank transactions that are over a certain dollar amount, as well as all bank

transactions that exhibit certain suspicious characteristics. To this end, M&T purportedly employs multiple sophisticated systems and processes designed to identify suspicious transactions and comply with rigorous federal AML regulations.

10. Moreover, in conjunction with the Account Agreement, the M&T Funds Transfer Agreement (the "Funds Transfer Agreement"),[4] which governs foreign funds transfers and is subject to applicable Account Agreement provisions, states that all foreign funds transfers are subject to banking and regulatory practices, laws, rules, regulations, and restrictions of U.S. government and U.S. payment systems. *See* Funds Transfer Agreement at §23.

11. In addition, M&T has a Code of Business Conduct and Ethics (the "Code of Conduct") that applies to all M&T employees.[5] In the Code of Conduct, M&T requires its employees, including those who interacted with Ms. Pitrone, to comply with all applicable laws, rules and regulations, and it states that M&T provides trainings at regularly scheduled intervals, including mandatory annual assigned training, to educate its employees and to promote compliance with laws, rules, and regulations. *See* Code of Conduct at 6.

12. Despite (1) M&T's federally mandated systems designed to detect suspicious transactions; (2) the standard practices and protocols employed across the banking industry to protect elderly customers; and (3) M&T's policies intended to comply with federal regulations and thus ensure that its customer-facing employees have the knowledge and skill to recognize elder

---

[4] A true and correct copy of the Funds Transfer Agreement, operative as of January 2023, is attached hereto as Exhibit C, which, upon information and belief, reflects the relevant terms of the Funds Transfer Agreement that was in effect during the period described in these pleadings. This Funds Transfer Agreement is cited herein as "Funds Transfer Agreement at [ ]."

[5] *See* M&T Bank, N.A., Code of Business Conduct & Ethics. (Rev. 4/2024), https://ir.mtb.com/static-files/1c8c627e-2938-46a4-97cc-44aacb613f91 (last accessed Oct. 10, 2024).

4

financial exploitation, M&T repeatedly ignored the obvious red flags raised by both of Ms. Pitrone's international wire transfers on August 4 and August 8, 2024. M&T employees woefully failed to investigate Ms. Pitrone's wire transfer requests or to determine whether her assets were at risk. Instead, when faced with textbook evidence of elder financial exploitation, M&T employees did nothing. This situation is further exacerbated by M&T's awareness of the Data Breach that had recently occurred and M&T's claimed monitoring of Ms. Pitrone's Accounts.

13. M&T's utter failure to take any action to protect her assets when confronted with clear evidence of exploitation constitutes a breach of its contractual duty of ordinary or reasonable care in its dealings with Ms. Pitrone. Ms. Pitrone therefore brings this action for breach of contract to enforce M&T's duty of care.

14. As a result of M&T's breach of contract, Ms. Pitrone was defrauded of assets totaling $478,000. But for M&T's violation of its contractual duty of ordinary or reasonable care in this matter, Ms. Pitrone would not have lost these amounts.

15. Ms. Pitrone now brings suit to recover those funds.

## THE PARTIES

16. Plaintiff Anne Pitrone is a resident of Tenafly, New Jersey, who maintained two personal M&T bank accounts.

17. Defendant M&T Bank, N.A. is a national association bank with its main office, as listed in its federal charter, in Oakfield, New York.

## JURISDICTION & VENUE

18. Ms. Pitrone is a resident of New Jersey. As provided in its articles of association, M&T's main office is in New York and, thus, M&T is a resident of New York. Accordingly, there is complete diversity between the parties as to these claims. As alleged herein, the amount in

controversy between the parties exceeds $75,000, exclusive of interest and costs. This Court therefore has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

19. This Court has personal jurisdiction over M&T because the causes of action arise from M&T's contacts within this judicial district.

20. Venue is proper in this judicial district because a substantial amount of the transactions, practices, and courses of conduct at issue occurred within this district, and because M&T conducts business in this district. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### I. Ms. Pitrone's Data Was Stolen

21. In 2023, M&T customer data was stolen in a Data Breach targeting the MOVEit file transfer software owned by Progress Software and used by M&T. The data stolen in the breach included M&T customer names, addresses, and account numbers. Progress Software has stated publicly that it patched the software issue that allowed for the data breach on May 31, 2023.[6]

22. M&T did not notify its customers of the Data Breach until at least mid-August, when M&T sent customers a letter dated only "August 2023." *See* Notice Letter. The Notice Letter stated that Ms. Pitrone's name, address, and account numbers had been compromised. Notice Letter at 1.

23. The Notice Letter also stated that M&T would "continue to closely monitor [Ms. Pitrone's] accounts for potentially fraudulent activity," suggesting that M&T had in fact been

---

[6] Caitlin Burchill, Some M&T Bank Customer Information Hacked in Massive Data Breach, NBC Connecticut (Aug. 30, 2023, 5:52 PM), https://www.nbcconnecticut.com/investigations/nbc-ct- responds/some-mt-bank-customer-information-hacked-in-massive-data-breach/3095301/.

closely monitoring the Accounts up to that point. *Id.* Clearly, M&T had performed no such close monitoring, and, by the time it finally sent the Notice Letter, the damage had already been done to Ms. Pitrone.

24. Under New Jersey law, the willful, knowing, or reckless failure to provide reasonable notice under § 56:8-163(a) constitutes an unlawful practice under N.J.S.A. § 56:8-166. Ms. Pitrone is therefore entitled to treble damages.  N.J.S.A. § 56:8-19.

## II. Ms. Pitrone Was Targeted by Fraudsters.

25. On August 2, 2023, when she was 72 years old, Ms. Pitrone was using her laptop computer to browse the internet when it suddenly froze and became inoperable. A window appeared on the screen instructing Ms. Pitrone to call an 800- telephone number.

26. Ms. Pitrone dialed the number and spoke with individuals who presented themselves as "Microsoft Security Agents" and "M&T Bank Investigator Security Agents." These "agents" told Ms. Pitrone that M&T employees at the Cresskill Branch had sold her identity and personal banking information to criminals and that wiring the funds in her Accounts to a specific "Federal Reserve Security Custody" account was the only way to protect her savings.

27. When Ms. Pitrone expressed concern about the security of the funds she kept at another financial institution, the "agents" told her they were not worried about any other accounts she has—it was only Ms. Pitrone's Accounts with M&T that they needed to secure.

28. The "agents" insisted that Ms. Pitrone not discuss the reason for her activity with any employees at the Cresskill Branch because they were all under investigation and potentially were complicit in the wrongdoing against Ms. Pitrone and others. In fact, the "agents" were fraudsters. The fraudsters unfroze Ms. Pitrone's laptop shortly after their phone call and began a month-long period in which they communicated with Ms. Pitrone multiple times per day, updating

her on the status of their investigation and, most critically, instructing her on how to transfer funds out of her Accounts and into their own.

## II. **M&T Facilitated Seven Highly Suspicious Wire Transfers for Ms. Pitrone.**

29. Ms. Pitrone opened her Accounts with M&T over two decades ago. Over the ensuing years, Ms. Pitrone used the Accounts as any ordinary consumer banking customer would and had no history of large or frequent high-dollar transactions or any international wire transfers.

30. Prior to the events at issue here, Ms. Pitrone had never sent a single wire transfer from the Account, let alone an international wire transfer. However, between August 4, 2023, and August 8, 2023, Ms. Pitrone made two extraordinary international wire transfers that were completely out of character for her Accounts.

31. On August 4, 2023, the day Ms. Pitrone's unusual transactions commenced, the Account had a beginning balance of $242,395.62. Following the fraudsters' instructions, Ms. Pitrone initiated the first wire transfer in-person at the Cresskill Branch that same day, ordering that $238,000 be wired from Account 1 to an account with Hang Seng Bank in Hong Kong held in the name of Yang Minfan (the "First Transfer").[7]

32. On August 8, 2023, Ms. Pitrone returned to the Cresskill Branch and ordered that $240,000 be wired from Account 2 to the same account with Hang Seng Bank in Hong Kong held in the name of Yang Minfan (the "Second Transfer").[8]

---

[7] A true and correct copy of the Combined Disclosure/Receipt for Consumer Foreign Wire Transfer dated August 4, 2023, from Ms. Pitrone to Yang Minfan (the "First Transfer Order") is attached hereto as Exhibit D.

[8] A true and correct copy of the Combined Disclosure/Receipt for Consumer Foreign Wire Transfer dated August 8, 2023, from Ms. Pitrone to Yang Minfan (the "Second Transfer Order") is attached hereto as Exhibit E.

33. In all, over the course of only four days, Ms. Pitrone made two international wire transfers totaling $478,000.

34. Given her age, Ms. Pitrone was the typical target for this particular fraud scheme. Yet, M&T ignored its basic obligations to Ms. Pitrone, which allowed the fraudsters to successfully execute their scheme. No M&T employee properly questioned Ms. Pitrone's behavior or discussed with Ms. Pitrone the clear evidence that she was being scammed. Indeed, M&T repeatedly failed to exercise ordinary care under the Account Agreement and failed to act in a commercially reasonable manner in its transactions with Ms. Pitrone as its banking customer.

35. The Account Agreement expressly provides that M&T owes its banking customers a duty of ordinary or reasonable care, and to implement and maintain commercially reasonable policies and procedures to prevent and detect, *inter alia*, fraud. Account Agreement at §§ 16, 21. Ms. Pitrone's account activity clearly indicated that she was the victim of elder financial exploitation. M&T breached its duty of ordinary care when it repeatedly failed to respond appropriately to the obvious and substantial evidence that Ms. Pitrone was being defrauded, despite M&T's extensive institutional knowledge of elder financial exploitation and its knowledge of Ms. Pitrone's stolen data.

### III. The Banking Industry Routinely Monitors for and Reports Incidents of Elder Abuse and Financial Exploitation.

36. As a national association bank, M&T is subject to the federal Bank Secrecy Act and its implementing regulations, which establish an array of anti-money laundering procedures and practices. Among other things, these procedures and practices mandate the tracking and reporting of all bank transactions that are over a certain dollar amount, as well as all bank transactions that exhibit certain suspicious characteristics. To this end, M&T purportedly employs

multiple sophisticated systems and processes designed to identify suspicious transactions and comply with rigorous federal AML regulations.

37. As required by statute, BSA/AML programs must be designed to detect and notify federal authorities of potential wrongdoing through the generation of suspicious activity reports ("SARs"). *See, e.g.*, 12 C.F.R. § 208.62. A bank is obligated to file a SAR when it detects a known or suspected violation of federal law, known or suspected money laundering, or a violation of the BSA. *Id.* Such situations specifically include transactions involving funds totaling $5,000 or more where "[t]he transaction has no business or apparent lawful purpose *or is not the sort in which the particular customer would normally be expected to engage*, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction." 12 C.F.R. § 208.62(c)(4)(iii); 12 C.F.R. § 353.3(a)(4)(iii); 31 C.F.R. § 1020.320(a)(2)(iii) (emphasis added).

38. According to the BSA and its implementing regulations, a bank's effective AML program must include the development of internal policies and procedures, an ongoing employee training program, and an independent audit function to test internal programs. *See* 31 U.S.C. § 5318(h); 31 C.F.R. § 1020.210(a).

39. To comply with the BSA, banks must remain vigilant for signs of suspicious activity. Specific red flags include: when a customer sends "many funds transfers in large, round dollar, hundred dollar, or thousand dollar amounts"; when "[f]unds transfer activity occurs to or from a financial secrecy haven, or to or from a higher-risk geographic location without an apparent business reason or when the activity is inconsistent with the customer's business or history"; when "[f]unds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations"; when "[m]any small, incoming transfers of

funds are received, or deposits are made using checks and money orders. Almost immediately, all or most of the transfers or deposits are wired to another city or country in a manner inconsistent with the customer's business or history"; a customer's "transfer activity is unexplained, repetitive, or shows unusual patterns"; a customer's "payments or receipts [have] no apparent links to legitimate contracts, goods or services"; when "[f]unds transfers are sent or received from the same person to or from different accounts"; where "deposits are structured through multiple branches of the same bank"; when "an account with little activity . . . suddenly experiences large deposit and withdrawal activity"; and when a customer "makes high-value transactions not commensurate with the customer's known incomes."[9]

40. Beyond these federally mandated systems, though, it has become standard industry practice for banks to monitor their elderly customers' transactions for evidence of elder financial exploitation. According to a recent biennial survey by the American Bankers Association Foundation (the "ABA Foundation") on the banking industry's treatment of elderly customers, banks routinely generate SARs to report suspected elder financial exploitation and fraud.[10] Since 2013, the Financial Crimes Enforcement Network ("FinCEN"), which receives and maintains a database of SARs, has provided an electronic SAR filing with a designated category for "elder financial exploitation."[11]

---

[9] *See* FFEIC, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* F-2–F-3, F-7–F-8 (2015), https://bsaaml.ffiec.gov/docs/manual/10_Appendices/07.pdf (last accessed Oct. 10, 2024).

[10] American Bankers Ass'n Found., *Older Americans Benchmarking Report* 16 (2021), https://www.aba.com/-/media/documents/reference-and-guides/2021-older-americans-benchmarking-report.pdf?rev=a49fbb30f89d4b82aca50ba05f68d218 (last accessed Oct. 10, 2024).

[11] Consumer Financial Protection Bureau, Suspicious Activity Reports on Elder Financial Exploitation: Issues and Trends 6 (Feb. 2019),

41. The ABA Foundation also determined that "[t]raining bank employees in fraud awareness and prevention is now standard practice among banks and arguably the best defense against elder financial exploitation." American Bankers Ass'n Found., *Older Americans Benchmarking Report* at 20. Furthermore, "[m]ore than eight out of 10 banks require staff to undergo training in serving older customers and recognizing signs of fraud and exploitation." *Id.* "Most banks report that they conduct employee training both at the time of hiring and annually. Eighty-four percent of banks provide annual training for frontline staff." *Id.* at 21.

42. Moreover, "[b]ank training to combat elder financial exploitation goes beyond frontline staff, giving banks more soldiers in the battle. Six out of 10 banks report requiring all staff, not just frontline customer service staff, to take training on how to detect and report elder financial exploitation." *Id.* The ABA Foundation also found that "[b]anks are assertive in protecting older customers. Nearly all banks surveyed (93%) report that they file a suspicious activity report (SAR), flag accounts, close accounts or report to Adult Protective Services when banks suspect elder financial exploitation." *Id.* at 4. Based on the ABA Foundation survey, banks have established a reasonable and customary industry norm to take some kind of protective action when facing an elderly customer presenting possible signs of financial exploitation.

### IV. M&T Purportedly Complies with Federal Laws and Regulations and Claims to Apply Industry Standard Practices to Combat Elder Financial Exploitation.

43. M&T purportedly requires its employees, including those who interacted with Ms. Pitrone, to recognize and report suspicious transactions like Ms. Pitrone's.

---

https://files.consumerfinance.gov/f/documents/cfpb_suspicious-activity-reports-elder-financial-exploitation_report.pdf (last accessed Oct. 10, 2024).

44. M&T has a Code of Business Conduct and Ethics (the "Code of Conduct") that applies to all M&T employees.[12] In the Code of Conduct, M&T requires its employees, including those who interacted with Ms. Pitrone, to comply with all applicable laws, rules and regulations, and it states that M&T provides trainings at regularly scheduled intervals, including mandatory annual assigned training, to educate its employees and to promote compliance with laws, rules, and regulations. *See* Code of Conduct at 6.

45. M&T further dedicates a portion of its website regarding "[p]rotecting at-risk or vulnerable adults," demonstrating its industry knowledge and awareness of the proliferation and increase of elder financial scams impacting elderly adults.[13]

### V. M&T Failed to Exercise Ordinary Care in Fulfilling its Contractual Obligations and Failed to Act in a Commercially Reasonable Manner in Protecting Ms. Pitrone's Assets.

46. As a threshold matter, M&T was on notice of Ms. Pitrone's compromised data and high-risk of fraud activity because of the Data Breach and Notice Letter. *See generally* Notice Letter. Moreover, Ms. Pitrone's bank transactions described above present obvious signs of suspicious account activity. Those signs, red flags all, should have also put M&T on notice that Ms. Pitrone's assets were at risk. The transactions represent a sudden change in account usage; large amounts of money began moving into and out of the Accounts in quick succession; several large transactions were made sending funds to a jurisdiction and to banks known to be destinations used by scammers; and the wires were all large, round dollar amounts. Each of Ms. Pitrone's wire transfers exceeded $5,000.00; thus, each wire should have generated a SAR in accordance with

---

[12] *See* M&T Bank, N.A., Code of Business Conduct & Ethics. (Rev. 4/2024), https://ir.mtb.com/static-files/1c8c627e-2938-46a4-97cc-44aacb613f91 (last accessed Oct. 10, 2024).
[13] M&T Bank, "Protecting At-Risk or Vulnerable Adults." https://www.mtb.com/help-center/banking-security/protecting-at-risk-or-vulnerable-adults (last accessed Oct. 10, 2024).

federal banking requirements. Additionally, each wire should have triggered M&T's fraud-related systems and protocols. With so many red flags and triggers, each wire should have been reported, questioned, and investigated. And, the Accounts should have been frozen, which would have prevented the loss of Ms. Pitrone's life savings. Instead, M&T took no action whatsoever.

47. M&T either failed to maintain or failed to employ its industry-standard protocols, which, if properly maintained and employed, would have led M&T to flag, investigate, and intervene in Ms. Pitrone's truly extraordinary banking transactions. Equally in breach of its duty of care, M&T either failed to recognize or failed to respond to obvious evidence of elder financial exploitation. Given Ms. Pitrone's age, account history, and in-person interactions with bank personnel, Ms. Pitrone's transactions should have triggered not only M&T's AML and fraud detection measures, but also its elder financial exploitation prevention measures. M&T proudly promotes all that it does to protect its elderly customers but, inexplicably, it did absolutely nothing here.

48. Given the broad scope of M&T's federally-mandated monitoring for money-laundering and fraud, the ubiquity of scams targeting older adults, and the extent to which M&T voluntarily has implemented, and publicly touted, controls to prevent financial exploitation of older customers, M&T's contractual duty to exercise ordinary care obligated the bank to implement its relevant procedures and protocols in response to Ms. Pitrone's unambiguously suspicious transactions. M&T simply ignored blatant evidence that Ms. Pitrone was being exploited. The scope and contours of M&T's contractual duty of care is set forth in the Account Agreement and Funds Transfer Agreement. *See* Account Agreement at, *e.g.,* §16, 21; *See* Funds Transfer Agreement at §23.

49. Given the federal legal requirements, the banking industry's customary practices, and M&T's internal protocols and procedures, monitoring for and protecting its elderly customers from financial exploitation are fundamental elements of M&T's basic consumer banking operations.

50. Based on the foregoing, M&T has clearly breached its contract with Ms. Pitrone. But for M&T's careless and negligent actions constituting that breach, Ms. Pitrone would not have been defrauded of her life savings. Through its consistent and complete disregard for Ms. Pitrone's wellbeing and its utter neglect of its obligations to its elderly customers, M&T allowed Ms. Pitrone's life savings to pass through the Account and into the hands of criminal third parties.

## COUNT I
### Breach of Contract

51. Ms. Pitrone incorporates the allegations in Paragraphs 1–50 as if fully set forth herein.

52. Ms. Pitrone's Account Agreement is a binding contract between M&T Bank and Ms. Pitrone.

53. M&T's duty of ordinary care is expressly provided in the Account Agreement, contractually obligating M&T to exercise ordinary and reasonable care in its dealings with Ms. Pitrone, and to implement and maintain commercially reasonable policies and procedures to prevent and detect, *inter alia*, fraud. Account Agreement at §§ 16, 21.

54. M&T's BSA/AML obligations, the standard banking industry practices outlined in the ABA Foundation's biennial survey, and together with M&T's Code of Conduct and provision §23 of the Funds Transfer Agreement all demonstrate that M&T's contractual duty of ordinary care requires it to comply with federal regulations, and as part of that compliance, monitor and

15

take action when confronted with clear evidence of elder financial exploitation against one of its customers.

55. Ms. Pitrone, an elderly consumer banking customer, made two massive, large-dollar, round-number international wire transfers in quick succession over four days from an M&T branch. These banking activities, involving a total amount of $478,000.00 were completely inconsistent with Ms. Pitrone's historic Account activity.

56. When Ms. Pitrone ordered each of the wire transfers at issue in this action, it presented M&T personnel clear and obvious evidence of elder financial exploitation. Moreover, M&T was on notice of Ms. Pitrone's compromised account information in light of the Data Breach and Notice Letter.

57. Under the circumstances, ordinary care required M&T to investigate each of Ms. Pitrone's highly suspicious wire transfers, freeze her Accounts, and take the steps necessary to protect her assets.

58. Instead, M&T repeatedly ignored every red flag signaling that Ms. Pitrone was being defrauded and that her assets were in jeopardy. Not one M&T employee properly inquired into any of Ms. Pitrone's highly suspicious wire transfers, froze the Accounts, or took any other steps to protect her assets.

59. M&T's failures to investigate and intervene to stop each of Ms. Pitrone's wire transfers constitute discrete and separate breaches of contract under the Account Agreement.

60. M&T's breaches have caused Ms. Pitrone damages of more than $478,000.00. Given M&T Bank's failure to provide notice of the Date Breach in a reasonable time and otherwise protect the security of her Accounts, Ms. Pitrone is entitled to treble damages.

61. Ms. Pitrone seeks these damages plus pre- and post-judgment interest, as well as her attorneys' fees, costs, and any other amounts the Court deems just and proper.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

(a) Awarding compensatory damages totaling not less than $478,000.00, plus pre- and post-judgment interest;

(b) Awarding treble damages for M&T Bank's failure to comply with N.J.S.A. § 56:8-19.

(b) Awarding attorneys' fees, expenses, and the costs of ligation; and

(c) Awarding such other and further relief which the Court finds just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 21, 2024                          Respectfully submitted,

                                                              **SCHULMAN BHATTACHARYA, LLC**

                                            By:   /s/ Jeremy Schulman
                                                    Jeremy W. Schulman
                                                    6116 Executive Boulevard, Suite 425
                                                    North Bethesda, MD 20852
                                                    Tel: (240) 356-8550
                                                    Email: jschulman@schulmanbh.com

                                                    *Counsel for Plaintiff Anne Pitrone*